[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. GateHouse Media Ohio Holdings II, Inc. v. Columbus Police Dept.*, Slip Opinion No. 2025-Ohio-5243.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-5243

THE STATE EX REL. GATEHOUSE MEDIA OHIO HOLDINGS II, INC., D.B.A. THE COLUMBUS DISPATCH *v.* COLUMBUS POLICE DEPARTMENT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. GateHouse Media Ohio Holdings II, Inc. v. Columbus Police Dept.*, Slip Opinion No. 2025-Ohio-5243.]**

*Mandamus—Public-records requests—Public Records Act specifically exempts from disclosure crime-victim information that is prohibited from release under R.C. 2930.07—Police officers are persons against whom crimes can be committed and can therefore be victims under Article I, Section 10a of Ohio Constitution and R.C. 2930.07—Redaction of identifying information in bodycam and dashcam footage was proper—Writ denied.*

(No. 2023-1327—Submitted February 11, 2025—Decided November 25, 2025.)

IN MANDAMUS.

————————————

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and DETERS, HAWKINS, and SHANAHAN, JJ., joined.  FISCHER, J., concurred in part and

dissented in part, with an opinion. BRUNNER, J., concurred in part and dissented in part, with an opinion.

**DEWINE, J.**

{¶ 1} The Ohio Constitution protects privacy rights of crime victims under a provision known as Marsy's Law. *See* Ohio Const., art. I, § 10a. A "victim" under the Constitution is "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act." Ohio Const., art. I, § 10a(D). The question in this case is whether two police officers—who were targeted by a criminal offender during a shootout—are victims under Marsy's Law.

{¶ 2} We must answer that question because the Columbus Dispatch seeks unredacted footage of a shootout. The Columbus Police Department ("the CPD") redacted the footage to conceal the identities of the officers. It did so based on a statutory provision that prohibits the disclosure of identifying information of a "victim," as that term is defined under Marsy's Law. The Dispatch contends that because the officers were on duty, they cannot be "victims." Indeed, it claims that police officers performing their public duties can never be victims under Marsy's Law.

{¶ 3} We disagree. The two officers were victims of a crime under the plain terms of the constitutional definition. They were persons against whom a "criminal offense . . . [was] committed," Ohio Const., art. I, § 10a(D). Therefore, we deny the Dispatch's request for a writ of mandamus ordering the CPD to produce unredacted copies of the shootout footage.

## I. A Police Shootout and a Public-Records Request

{¶ 4} In the summer of 2023, armed men robbed a Columbus Porsche dealership. Two officers—who have been identified in this litigation as Officer

John Doe 1 and Officer John Doe 2—responded to a radio call and joined in the pursuit of the fleeing robbers.

{¶ 5} The officers spotted the suspects' car on I-70 and gave chase. A few minutes later, the suspects stopped their car in the middle of the highway and the officers saw two men jump out and run away. Officer Doe 1 left his police cruiser and began chasing after them. Suddenly, a hidden third suspect emerged and fired his gun at Officer Doe 1, shooting him five times at close range.

{¶ 6} Officer Doe 1 returned fire while bleeding on the ground. Officer Doe 2 took cover behind a car and returned fire as well. During the exchange, the third suspect began walking directly towards Officer Doe 2. According to Officer Doe 2, the suspect appeared to be aiming his gun at him. Ultimately, the suspect was shot and killed by a barrage of gunfire directed at him by Officer Doe 1, Officer Doe 2, and other officers who had arrived on the scene.

{¶ 7} Officer Doe 1 was immediately transported to the hospital, where he remained for three weeks. He underwent at least seven surgeries and a stint in a long-term rehabilitation center. Fortunately, he survived.

{¶ 8} On the day of the shooting, a Dispatch reporter made a public-records request to the CPD for "all body camera, dash camera and 911 calls etc." from the shootout. Four days later, the CPD emailed media members—including the Dispatch—denying all requests for bodycam and dashcam footage from the shootout based on (1) R.C. 149.43(A)(17), which generally excludes from the definition of "public record" bodycam and dashcam footage that shows grievous bodily harm or severe violence that results in serious physical harm; (2) R.C. Ch. 2930, the statutory implementation of Marsy's Law; and (3) R.C. 149.43(A)(1)(v), which excludes from the definition of "public record" any "[r]ecords the release of which are prohibited by state or federal law."

{¶ 9} Several weeks later, the CPD released portions of the requested bodycam footage. It redacted the footage to conceal the identities of the two police

officers and ended the video before the shooting starts. The Dispatch insisted it was entitled to unredacted footage and ultimately filed this original mandamus action, asking us to order the CPD to produce the requested bodycam and dashcam footage, including the portions where Officer Doe 1 and Officer Doe 2 are identified. The CPD argues that the unredacted footage is not subject to release because it would disclose the identities of crime victims.

{¶ 10} We granted an alternative writ, ordering both parties to submit evidence and briefs. 2024-Ohio-202. Under seal, the CPD submitted four unredacted videos from the shootout and affidavits from Officer Doe 1 and Officer Doe 2. It also publicly filed redacted versions of the affidavits.

## II. We Deny the Writ

{¶ 11} To obtain a writ of mandamus ordering production of the unredacted footage in this public-records case, the Dispatch must show that it has a clear right to the footage and that the CPD has a corresponding clear legal duty to provide it. *State ex rel. Cincinnati Enquirer v. Sage*, 2015-Ohio-974, ¶ 10. But because the CPD is withholding the footage based on a statutory exception, the CPD has the burden to show that the exception applies. *See Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 2020-Ohio-5371, ¶ 27. In determining whether the CPD has demonstrated that the statutory exception applies, our task is "to provide a fair reading of what the legislature has enacted: one that is based on the plain language of the enactment and not slanted toward one side or the other," *Stingray Pressure Pumping, L.L.C. v. Harris*, 2023-Ohio-2598, ¶ 22.

### A. Information Identifying a Victim is Not a Public Record under Ohio Law

{¶ 12} The CPD contends that it is not required to provide the unredacted footage because the Public Records Act excludes certain crime-victim information from its definition of a public record. *See* R.C. 149.43(A)(1)(rr). We begin by detailing the statutory treatment of victim information and explaining how the statutory scheme intersects with the Ohio Constitution.

4

{¶ 13} Marsy's Law guarantees crime victims a right to be treated with "fairness and respect for the victim's safety, dignity and privacy." Ohio Const., art. I, § 10a. To implement this constitutional privacy protection, the legislature has enacted R.C. 2930.07 ("the Victim Privacy Law"), which mandates the privacy of certain information relating to crime victims. On the request of a crime victim, "case documents . . . shall be redacted prior to public release pursuant to [the Public Records Act] to remove the name, address, or other identifying information of the victim." R.C. 2930.07(D)(1)(a)(i). "Case document[s]" include "audio or video recording[s] of a victim of . . . an offense of violence . . . regarding a case that is submitted to a court, a law enforcement agency or officer, or a prosecutor or filed with a clerk of court." R.C. 2930.07(A)(1)(a).[1]

{¶ 14} Under the Victim Privacy Law, "'[v]ictim' has the same meaning as in Section 10a of Article I of the Ohio Constitution," R.C. 2930.01(H). That is, a "victim" is "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act," Ohio Const., art. I, § 10a(D).

{¶ 15} This protection of crime-victim information is incorporated into the Public Records Act. "Records, documents, and information the release of which is prohibited under [the Victim Privacy Law]" are not "public records." R.C. 149.43(A)(1)(rr). Thus, while the Public Records Act generally provides for the disclosure of public records, the act specifically exempts from disclosure crime-victim information that is prohibited from release under the Victim Privacy Law.

{¶ 16} So, if Officer Doe 1 and Officer Doe 2 are victims under the Ohio Constitution, they are victims under the Victim Privacy Law. And if they are victims of an offense of violence, then the Victim Privacy Law prohibits the public

---

1. Aside from arguing that the police officers are not "victims," the Dispatch has not argued that the unredacted bodycam and dashcam footage otherwise falls outside the definition of a "case document." Thus, we limit our analysis to the "victim" portion of the statutory definition.

release of audio or visual recordings of them unless their identifying information is redacted. Because the parties don't dispute that the offenses committed against the officers are offenses of violence, the dispositive question is simply whether officers are victims under the Ohio Constitution.

### B. Police Officers Can Be Victims under the Ohio Constitution

{¶ 17} In interpreting the Ohio Constitution, we apply the original public meaning of a provision. *See State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, ¶ 40. Generally speaking, that means that we afford a provision the meaning that would have been ascribed to it by a competent speaker of the English language at the time of its adoption. *Id.*; *Pfeifer v. Graves,* 88 Ohio St. 473, 487 (1913). The first consideration is always a provision's text. It is "our duty . . . to determine and give effect to the meaning expressed in its plain language." *Newburgh Hts. v. State*, 2022-Ohio-1642, ¶ 17. Thus, "we consider how the language would have been understood by the voters who adopted the amendment." *Centerville v. Knab*, 2020-Ohio-5219, ¶ 22.

{¶ 18} Applying the plain text of the amendment, we have no difficulty concluding that an ordinary understanding of Marsy's Law's definition of victim encompasses the officers in this case. A "victim" is "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act." Ohio Const., art. I, § 10a(D). A police officer is a "person" under any reasonable definition of the word. *See Webster's Third New International Dictionary* (2002) (defining "person" as "an individual human being").

{¶ 19} Further, no one disputes that the offender committed a criminal act when he shot at the two police officers. First, Officer Doe 1. The evidence shows that he was shot several times. He was therefore a victim of felonious assault— "[c]aus[ing] or attempt[ing] to cause physical harm to another . . . by means of a deadly weapon," R.C. 2903.11(A)(2)—which is statutorily defined as an offense of

violence, R.C. 2901.01(A)(9)(a). Similar logic applies to Officer Doe 2. The evidence shows that he was directly approached by an armed suspect after that suspect had shot Officer Doe 1. He was therefore a victim of aggravated menacing—"knowingly caus[ing] another to believe that the offender will cause serious physical harm to the person or property of the other person," R.C. 2903.21(A)—which is also statutorily defined as an offense of violence, R.C. 2901.01(A)(9)(a).

{¶ 20} Finally, the acts were plainly committed "against" the police officers—the criminal conduct was directed at them. Consistent with the ordinary understanding of "against," *Black's Law Dictionary* (12th Ed. 2024) defines "crimes against persons" as "[a] category of criminal offenses in which the perpetrator uses or threatens to use force." Here, the offender shot Officer Doe 1 multiple times and then approached Officer Doe 2 while wielding a gun. Further, Officer Doe 1 is also a person who "was directly and proximately harmed by the commission of the offense"—he was wounded as the result of a criminal act.

{¶ 21} Despite this plain language, the Dispatch advances several arguments in support of its position that the officers were not victims. It premises these arguments on a claim that the constitutional definition of victim is ambiguous and suggests that, as a result, we should look beyond the text of the provision to ascertain the meaning of "victim." Its reasoning goes like this: (1) Marsy's Law's definition of victim uses the phrase "against whom the criminal offense . . . is committed" without defining criminal offense; (2) hence the term could include crimes such as making a false report or failing to comply with an order of a peace officer; (3) but these are really crimes against the State, not an individual officer; and (4) therefore a voter would not have understood the definition of "victim" to include a police officer.

{¶ 22} There are a couple flaws in this argument. First, there is nothing ambiguous or underdeterminative about the definition of "victim" as it applies in

this case.  And because, as we have already explained, the two police officers here unambiguously fall within the definition of "victim," we need look no further than the plain text.  *See State ex rel. Hunt v. Hildebrant*, 93 Ohio St. 1, 9 (1915).

{¶ 23} Second, it may well be true that when a person has made a false report to a police officer or committed a similar crime, the police officer is not a victim of that crime under the constitutional definition.  But that is not the case in front of us.  And the fact that not every police officer is a victim says nothing about the question here: whether Officer Doe 1 and Officer Doe 2 were victims.

{¶ 24} The Dispatch also advances a variety of extratextual arguments.  It claims, for example, that a voter would not have understood a police officer to be a "victim," because of the availability of worker's compensation benefits for officers injured on the job.  It also suggests that because police officers are officers of the State, a voter would not have wanted officers to have privacy rights enforceable against the public.

{¶ 25} We do not find any of these extratextual considerations persuasive or even particularly relevant.  The Dispatch's arguments are premised on the notion that a voter who voted on the Marsy's Law amendment would not have wanted to extend police officers the same rights as other victims.  But our task is not to speculate about the collective secret desires of voters; rather, it is to apply the text that they enacted.  As we explained over a century ago, "Where there is no doubt, no ambiguity, no uncertainty as to the meaning of the language employed by the Constitution makers, there is clearly neither right nor authority for the court" to look beyond the language of the Constitution itself.  *State v. Rose*, 89 Ohio St. 383, 387 (1914).

{¶ 26} This is not a case in which we have to determine whether an edge case fits within the scope of underdeterminative constitutional text.  This is a case in which the text is clear and determinative with respect to police officers.  They easily fall within the text's scope.  In other words, because police officers are

persons against whom crimes can be committed, they can be victims under Article I, Section 10a of the Ohio Constitution. Because the text itself provides a clear, determinative meaning, we need not consider the Dispatch's extratextual arguments. We have the answer.

### C. The CPD's Redactions Are Permissible

{¶ 27} As we have explained, the officers in this case are victims under the plain terms of the constitutional definition of that word. Therefore, the Victim Privacy Law requires that case documents "shall be redacted prior to public release pursuant to [the Public Records Act] to remove the name, address, or other identifying information of the victim." R.C. 2930.07(D)(1)(a)(i). Thus, the unredacted footage of the shootout falls within R.C. 149.43(A)(1)(rr), the Marsy's Law exception to the Public Records Act. Because this exception applies, the Dispatch cannot show that it has a right to the unredacted videos regarding Officer Doe 1 and Officer Doe 2. By operation of the Marsy's Law amendment to the Ohio Constitution and the Victim Privacy Law, the Dispatch is not entitled to the writ of mandamus that it seeks.

### D. Victims' Rights under the Ohio Constitution Do Not Conflict with Any Public Right to Access Public Records

{¶ 28} The Dispatch is not quite done yet. It argues that the Ohio Constitution provides a right of access to public documents and that if the Victim Privacy Law is read as justifying the withholding of identifying information of police officers involved in use-of-force incidents, the Victim Privacy Law would violate the Constitution.

{¶ 29} The Dispatch does not identify any specific textual guarantee to support its claimed right of access. Instead, it makes a generalized claim based on several provisions of the Ohio Constitution:

- Article I, Section 1: "All men are, by nature, free and independent, and have certain inalienable rights . . . ."

- Article I, Section 3: "The people have the right to assemble together, in a peaceable manner, to consult for their common good; to instruct their Representatives; and to petition the general assembly for the redress of grievances."

- Article I, Section 11: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

- Article I, Section 16: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

In the Dispatch's view, the cumulative effect of these provisions is that the Victim Privacy Law is unconstitutional as it applies to this case. *See* Dispatch Merit Brief at 24 (asking this court to find a right to access government records "in the protections for property and free speech rights enumerated in the Ohio Constitution").

{¶ 30} The Dispatch faces an uphill battle with this argument. First, this court has never recognized a free-standing constitutional entitlement to public records emanating from some amorphous combination of constitutional provisions. Instead, when we have recognized a constitutional right to public records, we have done so based on the terms of a specific provision of the Ohio Constitution. *See, e.g.*, *Bloom*, 2024-Ohio-5029, at ¶ 60 (finding a statute unconstitutional because Article I, Section 16's open-courts provision encompasses a qualified right to obtain access to court transcripts).

{¶ 31} Second, the Dispatch faces an immediate hurdle because of the constitutional protection afforded to crime victims by Marsy's Law. While the Dispatch points to no direct textual support in the Constitution for the protection it seeks, Marsy's Law explicitly commands that victims be treated with "fairness and respect for [their] safety, dignity and privacy," Ohio Const., art. I, § 10a(A)(1).

10

Even if we were to conclude that the Constitution provides some generalized right to obtain public records, we would be hard pressed to say that this generalized right prevails over the more specific guarantee of crime-victim privacy rights established by Marsy's Law's constitutional protection. *See State v. Pribble*, 2019-Ohio-4808, ¶ 18 (explaining that, generally, when two provisions are in conflict, the specific provision prevails over the general provision); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 183-188 (2012); *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994), quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior," the particular amendment controls over a more general constitutional provision). Indeed, the Dispatch's task is particularly daunting here because Marsy's Law, which was adopted after the more general constitutional provisions on which the Dispatch relies, specifically provides that it "shall supersede all conflicting state laws," Ohio Const., art. I, § 10a(E).

{¶ 32} It is true that in the past this court has alluded to the possibility of limits on the General Assembly's power to restrict access to public records, *see, e.g.*, *State ex rel. Patterson v. Ayers*, 171 Ohio St. 369, 372 (1960) ("How far the General Assembly might go in limiting access to and inspection of public records is not now before us."). But we have also generally left the definition of what constitutes a public record to the General Assembly. *See id.* at paragraph one of the syllabus ("Generally, those records in the custody of public officials *which have been designated 'public records' by the General Assembly* are open to inspection by anyone at appropriate times" [emphasis added]); *see also Kish v. Akron*, 2006-Ohio-1244, ¶ 44. Indeed, we have recognized that the "General Assembly is the ultimate arbiter of policy considerations relevant to public-records laws." *Kish* at ¶ 44.

{¶ 33} Before we may find a legislative enactment unconstitutional, a challenger must establish a "clear incompatibility" between the Constitution and the law. *Cincinnati, Wilmington & Zanesville, RR. Co. v. Clinton Cty. Commrs.*, 1 Ohio St. 77, 82 (1852). Here, the General Assembly enacted the Victim Privacy Law under a constitutional provision that expressly provides for the privacy of victims. In doing so, it acted well within the scope of its constitutional authority. We find no incompatibility between the Constitution and the Victim Privacy Law as it applies to the bodycam and dashcam footage in this case.

### III. The First Opinion Concurring in Part and Dissenting in Part

{¶ 34} The first opinion concurring in part and dissenting in part ("the partial dissent") ultimately concurs with our conclusion that police officers can be victims under Marsy's Law and that the CPD properly redacted Officer Doe 1's and Officer Doe 2's identifying information from the shootout footage, though it analyzes the issues differently. But it dissents because it thinks that there are other videos and information that the Dispatch is entitled to based on the Dispatch's initial public-records request. Its reasoning loses its way in both the concurring and dissenting parts.

{¶ 35} "A writ of mandamus is an extraordinary remedy, 'exercised by this court with caution and issued only when the right is clear.'" *State ex rel. Jones v. Ohio State House of Representatives*, 2022-Ohio-1909, ¶ 5, quoting *State ex rel. Brown v. Ashtabula Cty. Bd. of Elections*, 2014-Ohio-4022, ¶ 11. To prove that it is entitled to this extraordinary remedy, a relator "must establish a clear legal right to the requested relief." *Sage*, 2015-Ohio-974, at ¶ 10. It is therefore imperative that a relator actually requests specific relief. Thus, in a public-records mandamus case, if there is a disparity between the scope of the relator's initial public-records request and the scope of the relief he seeks in his complaint for mandamus, it is the scope of relief he seeks in mandamus that controls. *See, e.g., State ex rel. McCaffrey v. Mahoning Cty. Prosecutor's Office*, 2012-Ohio-4246, ¶ 17-18. A

relator forfeits any claim to records not specified in his complaint. *Id.* And if the relator fails to develop an argument as a basis for mandamus relief, he forfeits his right to have the court consider that argument. *State ex rel. Cox v. Youngstown Civ. Serv. Comm.*, 2021-Ohio-2799, ¶ 12, fn. 1.

{¶ 36} The point is that it is up to the relator to bring his claims and arguments into this court. We will not "search the record or formulate legal arguments on behalf of the parties, because [we] do not sit as self-directed boards of legal inquiry and research, but preside essentially as arbiters of legal questions presented and argued by the parties before [us]." (Cleaned up.) *State v. Quarterman*, 2014-Ohio-4034, ¶ 19. "'[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present,'" *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 15, quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008), because "justice is far better served when it has the benefit of briefing, arguing, and [(when possible)] lower court consideration before making a final determination," *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, fn. 2 (1983). That is especially true when parties are seeking extraordinary relief like a writ of mandamus.

{¶ 37} Looking past these principles of judicial restraint, the partial dissent appoints itself lawyer for the Dispatch and makes arguments that it thinks the Dispatch should have made based on mandamus relief that it thinks the Dispatch should have requested. Then, without giving the CPD an opportunity to respond to its arguments, it puts back on the judicial robe and pronounces itself fully convinced by the arguments it has made on the Dispatch's behalf, declaring the Dispatch the victor.

{¶ 38} Other than the obvious problem of concluding that a party has met its burden to establish entitlement to an extraordinary writ based on arguments that

the party did not make, the partial dissent stumbles in several other respects. Here are just a few examples.

{¶ 39} The partial dissent confuses the broad scope of the Dispatch's initial public-records request with the much narrower scope of the relief it requested in mandamus. The partial dissent labors under the false impression that because the Dispatch submitted a very broad public-records request for "all body camera, dash camera and 911 calls etc." from the shootout, that is the relief it is requesting in mandamus. Thus, it speculates that there are other dashcam and bodycam videos that the Dispatch is entitled to, that the Dispatch is entitled to the identifying information of officers other than Officer Doe 1 and Officer Doe 2, and that the Dispatch is entitled to information that the CPD initially withheld under other Public Records Act exceptions. But this isn't the relief that the Dispatch asked for in mandamus. The Dispatch's mandamus complaint, merit and reply briefs, and its attorney's statements in oral argument all make perfectly clear that the only relief the Dispatch is seeking in mandamus is the identifying information of Officer Doe 1 and Officer Doe 2 that the CPD redacted according to the Marsy's Law exception and Victim Privacy Law from the two dashcam and two bodycam videos that it provided.[2]

{¶ 40} The scope of relief sought has never been in question. As the CPD noted in its brief, the Dispatch's complaint "[seeks] writs of mandamus to compel production of [Officer Doe 1 and Officer Doe 2's] names." CPD Merit Brief at 5; *see also* Complaint at 11-19. That is, specifically Officer Doe 1's and Officer Doe 2's names—nobody else's. Rather than dispute the CPD's characterization of its

---

2. If the reader has any questions on this point, he can peruse the mandamus filing on our public docket. *See* Supreme Court of Ohio, *Case Information*, https://www.supremecourt.ohio.gov /Clerk/ecms/#/caseinfo/2023/1327 (accessed Sept. 2, 2025). Oral argument is also available to view. *See* The Ohio Channel, *Case No. 2023-1327, State ex rel. Gatehouse Media Ohio Holdings II, Inc. v. Columbus Police Dept.*, https://ohiochannel.org/video/supreme-court-of-ohio-case-no-2023-1327-state-ex-rel-gatehouse-media-ohio-holdings-ii-inc-v-columbus-police-dept (accessed Sept. 2, 2025).

14

complaint, the Dispatch affirmed it by acknowledging "that the officers involved in this case were victims of . . . felonious assault . . . ; and aggravated menacing," Dispatch Reply Brief at 6, and by only making arguments regarding its claims to the only relief that it sought: versions of the two dashcam and two bodycam videos that the CPD initially provided that include Officer Doe 1's and Officer Doe 2's identifying information, *see* Dispatch Merit Brief at 2-3, 6-30. Besides one oblique passing reference in its merit brief, *see id.* at 9, nowhere in the Dispatch's complaint, briefing, or oral argument are other dashcam and bodycam videos or other Public Records Act exceptions even hinted at. Thus, the partial dissent is arguing that we should grant the Dispatch greater mandamus relief than it asks for.

{¶ 41} The partial dissent also goes astray by deciding several unargued legal issues because it thinks doing so "makes sense," first opinion concurring in part and dissenting in part, ¶ 69. It justifies deciding these unargued issues by noting that "'[t]he party presentation principle is supple, not ironclad.'" *Id.* at ¶ 64, quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020). It is true that "[t]here are . . . circumstances in which a modest initiating role for a court is appropriate." *Sineneng-Smith* at 376. But like the case that the partial dissent cites for that proposition, "this case scarcely fits that bill," *id.* This is not a case in which we have supplemental briefing, *see, e.g.*, *U.S. Natl. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993), in which we have a single unargued antecedent issue with a clear answer, *see, e.g.*, *Arcadia v. Ohio Power Co.*, 498 U.S. 73 (1990), or in which we have an unargued jurisdictional issue that we must analyze before getting to the merits, *see, e.g.*, *M.R. v. Niesen*, 2022-Ohio-1130. This is a mandamus case, in which the relator bears the burden of "establish[ing] a clear legal right to the requested relief," *Sage*, 2015-Ohio-974, at ¶ 10. We refuse to follow the partial dissent down the path of deciding that an unargued-for version of the Victim Privacy Law applies, then analyzing and deciding several more unargued legal issues, and ultimately concluding that the Dispatch has met its

burden of establishing a clear right to relief based on arguments that it never bothered to raise. Nor do we think it appropriate to engage the partial dissent in a debate about hypothetical legal issues that are not before this court. *See State ex rel. White v. Koch*, 2002-Ohio-4848, ¶ 18 ("we will not indulge in advisory opinions").

{¶ 42} Rather than act "'as [a] self-directed board[] of legal inquiry and research,'" *State v. Bodyke*, 2010-Ohio-2424, ¶ 19 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir. 1983), we stick to our constitutional "'role of neutral arbiter of matters the parties present,'" *Epcon*, 2024-Ohio-4989 at ¶ 15, quoting *Greenlaw*, 554 U.S. at 243.

## IV. Conclusion

{¶ 43} Police officers can be victims under Marsy's Law. Because Officer Doe 1 and Officer Doe 2 were victims of offenses of violence, the Victim Privacy Law requires redaction of their identifying information from the bodycam and dashcam footage that the Dispatch seeks. Thus, the unredacted videos are exempt from disclosure under the Public Records Act, and the Dispatch has not demonstrated its entitlement to a writ of mandamus.

Writ denied.

_____

**FISCHER, J., concurring in part and dissenting in part.**

{¶ 44} Following a high-speed chase of armed-robbery suspects on Interstate 70, Columbus police officers found themselves in a shootout with one of the suspects. The incident, which left one officer injured and one suspect dead, was recorded by the officers' body-worn cameras and dashboard cameras.

{¶ 45} Relator, GateHouse Media Ohio Holdings II, Inc., d.b.a. the Columbus Dispatch ("the Dispatch"), seeks a writ of mandamus to compel respondent, Columbus Police Department ("CPD"), to provide *all* unredacted body-worn-camera and dashboard-camera footage of that incident pursuant to a

public-records request the Dispatch made on July 6, 2023. I agree with the majority opinion that officers can be victims under R.C. 2930.01(H) and Marsy's Law, Article I, Section 10a of the Ohio Constitution, and that CPD has demonstrated that it properly redacted Officer John Doe 1's and Officer John Doe 2's identifying information from the requested records. However, I would also find that the Dispatch is entitled to limited portions of the requested records and thus is entitled to a partial writ of mandamus. For those reasons, I respectfully concur in part and dissent in part.

## I. Background

### A. The Shootout

{¶ 46} Columbus police officers pursued a vehicle driven by suspects who had committed an armed robbery of a Porsche dealership. During the pursuit, the suspects' vehicle became disabled in the middle lane on Interstate 70, blocking traffic.

{¶ 47} As Officer Doe 1 and Officer Doe 2 approached the disabled vehicle in their cruiser, two of the suspects fled on foot. Officer Doe 1 left his cruiser to pursue the suspects. But within a second or so of Officer Doe 1 taking chase, a third suspect, crouching beside the disabled vehicle, shot and injured him.

{¶ 48} The third suspect continued to shoot at Officer Doe 1, who had fallen to the ground. Defending his partner, Officer Doe 2 exchanged gunfire with the third suspect from behind a civilian's vehicle.

{¶ 49} The third suspect then abandoned his weapon and tried to flee. Frantically, he attempted to steal the officers' cruiser, but the door was locked. He then tried stealing a civilian's vehicle, but it too was locked. Having no luck, the third suspect ran down the open highway and away from the scene as sirens shrieked in the background. Both officers continued to shoot at the third suspect as he ran away.

{¶ 50} Other police cruisers arrived seconds later to aid Officer Doe 1 and Officer Doe 2. As other officers approached the scene, the third suspect stopped running, turned around, and walked back towards Officer Doe 1 and Officer Doe 2. The third suspect ignored Officer Doe 2's commands to get on the ground and continued walking towards the officers with his hands at his sides. Officer Doe 1, Officer Doe 2, and at least two other officers standing near Officer Doe 2 shot at the third suspect. The third suspect was struck by gunfire and fell.

{¶ 51} Officer Doe 2 and other officers ran to aid Officer Doe 1, who was lying on the ground injured and bleeding from his gunshot wounds. While officers placed a tourniquet on Officer Doe 1's leg to stop the bleeding, Officer Doe 2 raced to his cruiser to prepare to transport Officer Doe 1 to the hospital. While heading to his vehicle, Officer Doe 2 saw the third suspect's discarded weapon on the ground and alerted the other officers. Once Officer Doe 1 was loaded into the back of the cruiser, Officer Doe 2 rushed him to the hospital.

{¶ 52} Despite receiving medical aid from on-scene officers, the third suspect died at the scene. The two other suspects who had escaped were apprehended days later.

*B. The Dispatch's Public-Records Request*

{¶ 53} On July 6, 2023, the Dispatch made a public-records request under R.C. 149.43, Ohio's Public Records Act, to CPD for all body-worn-camera and dashboard-camera footage from the shootout.

{¶ 54} The next day, CPD released a statement: "Due to recently passed Marsy's Law and the direction of the Columbus City Attorney's Office, the Columbus Division of Police is unable to release the identities of the eight officers involved in this officer-involved shooting." In a formal response to the Dispatch's July 6 request, CPD initially denied the Dispatch's entire request for body-worn-camera and dashboard-camera footage from the shooting for four reasons: (1) the unredacted footage showed grievous bodily harm to a peace officer, R.C.

149.43(A)(1)(jj) and (A)(17)(f) ("grievous-bodily-harm exception"); (2) the unredacted video footage showed an act of severe violence resulting in serious physical harm to a peace officer while performing official duties, R.C. 149.43(A)(1)(jj) and (A)(17)(g) ("act-of-severe-violence exception"); (3) the unredacted footage is a "record[], document[], or information the release of which is prohibited under [R.C.] 2930.04 and 2930.07," R.C. 149.43(A)(1)(rr) ("victims' rights exception"); and (4) the unredacted footage is a record that is prohibited from release under state or federal law, R.C. 149.43(A)(1)(v) ("catch-all exception").

{¶ 55} However, according to the parties' agreed statement of facts, on September 12, CPD released "a portion of the recordings" sought by the Dispatch. CPD provided the Dispatch with four redacted videos related to the shooting: (1) Officer Doe 1's body-worn-camera footage, (2) Officer Doe 2's body-worn-camera footage, (3) dashboard-camera footage from Officer Doe 1 and Officer Doe 2's cruiser ("Doe cruiser"), and (4) dashboard-camera footage from another officer's cruiser ("other cruiser"). CPD redacted the footage of the shooting and its aftermath from all four videos. And CPD altered the footage to conceal the faces, voices, and other identifying information of all officers involved in the shooting.

{¶ 56} In an email sent to the Dispatch explaining the September 12 partial release, the Office of the City Attorney maintained that "videos of the shooting" are not public records for the same four reasons that it had listed in its initial denial letter, but that the videos leading up to the shooting were public records subject to redaction and release. The Office of the City Attorney also admitted that CPD had provided the Dispatch with only what CPD believed to be "the most relevant footage of the incident from involved officers pursuant to any redactions required under law."

*C. Dispatch Requests a Writ of Mandamus*

{¶ 57} On October 19, 2023, the Dispatch petitioned for a writ of mandamus to compel CPD to make available for inspection and copying in

accordance with R.C. 149.43(B)(1) "all video footage responsive to the Video Footage Request," which includes all body-worn-camera and dashboard-camera footage from the shooting. The Dispatch asserted that CPD failed to comply with its duty to provide "full and complete copies of the records sought" by its request. The Dispatch alleged that CPD bore the burden of demonstrating that an exception applies to prevent disclosure of the requested records and sought to challenge CPD's rationale for denying the Dispatch's request, including CPD's assertion that it cannot release the requested records under R.C. 149.43(A)(1)(rr), because the officers are "victims" under R.C. 2930.07 and Marsy's Law, Article I, Section 10a of the Ohio Constitution.

{¶ 58} CPD filed an answer to the Dispatch's petition, asserting that "based on the ordinary application of statutory law and case law as it existed at the time of the request, . . . the subject records contain exempt information under R.C. 149.43." While CPD admitted that the recordings of body-worn cameras and dashboard cameras are public records, it also asserted that the footage was prohibited from release under the grievous-bodily-harm exception, the act-of-severe-violence exception, the victims' rights exception, and the catch-all exception. CPD admitted that it had withheld the identifying information of eight officers who were involved in the officer-involved shooting because they were victims under Marsy's Law. But because CPD had released a portion of the recordings from two body-worn cameras and two dashboard cameras—providing no footage of the shooting and concealing the identities of the eight officers involved "as required by law"—CPD denied that the Dispatch had not "received full and complete copies of the records sought by its Video Footage Request." CPD asserted that it had "complied with all duties and obligations under the Public Records Act and other Ohio laws."

{¶ 59} CPD also moved for leave to file two affidavits using "John Doe" pseudonyms and to file affidavits with the names of the John Doe officers under seal. In support of its motion, CPD quoted R.C. 2930.07(D)(1)(a)(i) and argued

20

that that provision "mandates that, upon written request of a crime victim, all relevant case documents 'shall be redacted prior to public release . . . to remove the name, address, and other identifying information of the victim.'" CPD asserted that it had provided "the requested dash-cam and body-cam footage" to the Dispatch, but that it had "redacted the audio and visual portions that would reveal the name and identifying information of two Columbus Division of Police officers who were victims of an offense of violence caused by the shooting." CPD explained that it had redacted the recordings "based on its belief that it was required to do so by Marsy's Law, R.C. 2930.07" because the two John Doe officers qualify as victims. And CPD argued that it should be permitted to use pseudonyms because "the officers' privacy interests are established by statute."

{¶ 60} The Dispatch opposed the motion, arguing that because CPD had asserted that "eight officers were involved in the shootout underlying this case and are . . . victims of a crime," the legal question before this court is whether those eight officers qualify as "victims" under Marsy's law "as a matter of law."

{¶ 61} This court granted CPD's motion for leave to file the John Doe affidavits and sua sponte granted an alternative writ. 2024-Ohio-202. Additionally, this court sua sponte ordered CPD "to submit under seal for in camera inspection *all records it has withheld or redacted.*" (Emphasis added.). *Id.*

## II. Applicable Statutes

{¶ 62} As a threshold issue, we must determine which versions of the statutes govern this action. Do we apply the statutes that were in effect on July 6, 2023, when the Dispatch made its public-records request for body-worn-camera and dashboard-camera footage, which would be former R.C. 149.43, effective April 7 to October 2, 2023, and former R.C. 2930.07, effective April 6 to July 6, 2023? Or do we apply the statutes that were in effect on October 19, 2023, when the Dispatch petitioned for a writ of mandamus, which would be former R.C. 149.43, effective October 3, 2023, to October 23, 2024, and the current version of R.C.

2930.07, effective July 7, 2023? This determination is necessary so that we can properly analyze the Dispatch's public-records request for the footage and CPD's defenses against disclosure of the footage.

{¶ 63} In arguing that the records are public records subject to disclosure and that CPD is not entitled to redact the footage because the officers are not victims under Marsy's Law and R.C. 2930.07, the Dispatch relies on the statutes that were in effect at the time it petitioned for the writ of mandamus. And CPD, consistent with its responses to the Dispatch's public-records request—but despite its statement in its answer that it applied the statutes that were in effect at the time of the request—relies on those same statutes.

{¶ 64} Generally, under the principle of party presentation, "'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 15, quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). This general rule is a function of our adversarial system in recognition that "'the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" *Greenlaw* at 244, quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment.) However, "[t]he party presentation principle is supple, not ironclad." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020). There are circumstances in which the party-presentation principle does not apply. *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *U.S. Natl. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 440, 446-448 (1993) (lower court had discretion to consider the validity of an applicable law even when the

parties themselves did not raise the issue); *see also United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in judgment only).

{¶ 65} One such circumstance occurs when a court must determine antecedent or threshold legal issues that have a direct effect on the issue presented by the parties, even if those antecedent or threshold legal issues have not been raised or briefed. *E.g.*, *U.S. Natl. Bank of Oregon* at 446-447; *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990); *see Cardinal Chem. Co. v. Morton Internatl., Inc.* 508 U.S. 83, 88, fn. 9 (1993) (addressing a legal question as to which the parties agreed on the answer). This is because courts are limited to determining the rights of people or of property that are actually controverted in the case before it. *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917). "No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard." (Cleaned up.) *Id.* "The court cannot be controlled by agreement of counsel on a subsidiary question of law." *Id.*; *see State ex rel. Leis v. Bd. of Elections of Hamilton Cty.*, 28 Ohio St.2d 7, 8 (1971) (parties' concession regarding the applicability of a statute is not binding on a court as if it were a stipulation of fact, because such applicability is a conclusion of law); *see also Kocher v. Ascent Resources-Utica, L.L.C.*, 2023-Ohio-3592, ¶ 55 (7th Dist.) ("parties cannot concede or stipulate to matters of law"); *Diversified Capping Equip., Inc. v. Clinton Pattern Works, Inc.*, 2002-Ohio-2295, ¶ 24 (6th Dist.) (litigants may stipulate to facts but may not stipulate to what the law requires). Concluding that the party-presentation principle does not apply in these circumstances is required by the fundamental nature of our judicial system—the very essence of judicial duty is "to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177-178 (1803). Thus, "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to *identify and apply the proper construction of governing law*." (Emphasis added.) *Kamen* at 99; *see also U.S.*

*Natl. Bank of Oregon* at 446. To hold otherwise would permit litigants to manipulate courts into issuing advisory opinions on legal issues that would not have been resolved but for the litigants' agreement on a preliminary legal issue. *See U.S. Natl. Bank of Oregon* at 447.

**{¶ 66}** Which version of a statute to apply is a question of law that relates to the identification of the proper governing law. *See Bingham's Trust v. C.I.R.*, 325 U.S. 365, 370 (1945) ("whether the applicable statutes and regulations are such as to preclude the decision which the Tax Court has rendered [is] . . . a question of law"); *U.S. Natl. Bank of Oregon* at 446. Accordingly, we cannot blindly apply the versions of the statutes argued by the parties simply because the parties say they are applicable, especially when the facts of the case, as agreed by the parties, plainly put the question of applicability at issue. *Leis* at 8; *see also Turner v. CertainTeed Corp.*, 2018-Ohio-3869, ¶ 11; *In re D.R.*, 2022-Ohio-4493, ¶ 37, fn. 2 (Fischer, J., dissenting). "Stipulations involving legal conclusions do not relieve [courts] of [their duties] to determine such matters upon [their] own [analyses] of pertinent facts and legal theories." *Chas. Todd Corp., Inc. v. Rosemont Industries, Inc.,* 66 Ohio App.3d 691, 693 (1st Dist. 1990).

**{¶ 67}** And this is especially true here because the case before us is an original action. We are the trier of fact. *See State ex rel. Lindenschmidt v. Butler Cty. Bd. of Commrs.*, 1995-Ohio-49, ¶ 11. We are the only court that will rule in this case. It is of the upmost importance that we correctly identify the laws that govern this matter and apply those laws correctly and in conformity with the Ohio Constitution. *See Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 39 (courts lack discretion to make errors of law); *State ex rel. Martens v. Findlay Mun. Court*, 2024-Ohio-5667, ¶ 10 (courts cannot declare principles or rules of law that cannot affect the matter in the case); *U.S. Natl. Bank of Oregon*, 508 U.S. at 446 (a court asked to construe a law has the authority to determine whether the law exists or applies). We must address the predicate question—which versions of the statutes

apply—before analyzing the issues presented by the parties to ensure that we apply the law correctly in this case. *See State v. Harper*, 2020-Ohio-2913; *State ex rel. Maxcy v. Saferin*, 2018-Ohio-4035, ¶ 14; *M.R. v. Niesen*, 2022-Ohio-1130, ¶ 7; *see also State v. Gonzales*, 2017-Ohio-777, ¶ 20 (DeWine, J., concurring) (when this court wrongly decides a case, it should correct its erroneous holding sooner rather than later).

{¶ 68} Stare decisis requires us to apply the versions of the statutes that were in effect when a party made its public-records request. *See, e.g., State ex rel. Cordell v. Paden*, 2019-Ohio-1216, ¶ 11; *State ex rel. Summers v. Fox*, 2021-Ohio-2061, ¶ 21, fn. 3; *see also State ex rel. Jordan v. Dept. of Rehab. & Corr.*, 2025-Ohio-3051, ¶ 22 (Kennedy, C.J., dissenting). As a question of statutory interpretation, the determination which version of a statute applies "'is owed greater stare decisis effect than other sources of law,'" *State v. Williams*, 2024-Ohio-1433, ¶ 17, quoting *State v. Wilson*, 2022-Ohio-3202, ¶ 51 (DeWine, J., dissenting); *see Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 23 ("'stare decisis applies to the rulings rendered in regard to specific statutes'").

{¶ 69} Applying the statutes that were in effect at the time of the public-records request, consistent with our precedent, makes sense for a few reasons. First, applying the statutes that were in effect at the time the public-records request was made ensures that we follow the General Assembly's express intention that any amendments to a statute are presumed to be prospective unless made expressly retroactive. *See* R.C. 1.48. The General Assembly did not expressly make the amendments to R.C. 149.43 or 2930.07 retroactive. *See* 2023 Am.Sub.H.B. No. 33; 2023 Sub.S.B. No. 16; *see also State v. Hubbard*, 2021-Ohio-3710, ¶ 14. Therefore, the General Assembly has expressed no intention for this court to apply those amendments retroactively or retrospectively to this case.

{¶ 70} Second, applying the statutes that were in effect at the time the public-records request was made ensures that we follow the General Assembly's

express intention that amendments to statutes do not affect a right "previously acquired, accrued, accorded, or incurred thereunder." R.C. 1.58(A)(2). We have held that "[t]he Ohio Public Records Act grants the 'substantive right to inspect and copy public records.'" *Rhodes v. New Philadelphia*, 2011-Ohio-3279, ¶ 19, quoting *State ex rel. Beacon Journal Publishing Co. v. Waters*, 1993-Ohio-77, ¶ 9; *State ex rel. Clark v. City of Toledo*, 54 Ohio St. 3d 55, 56 (1990). That substantive right vests upon a party's request for public records, as the public office has a duty to promptly provide access to the requested public record and copy the record within a reasonable period of time. *See* R.C. 149.43(B)(1); *see also Wilson v. AC&S, Inc.*, 2006-Ohio-6704, ¶ 73-74 (12th Dist.) (a vested right may be created by statute and is understood to be the power to lawfully do certain actions or possess certain things; it amounts to something more than a mere expectation of future benefit or interest founded upon an anticipated continuance of existing laws). The Dispatch had a vested right when it made its July 6, 2023 public-records request. Thus, we should not apply the amended versions of the statutes here, because their application would interfere with that vested right.

{¶ 71} And third, we must apply the law in a manner that is constitutional—specifically, we cannot apply statutes retroactively when that application would affect a vested right, lest we run afoul of Article II, Section 28 of the Ohio Constitution. *Bielat v. Bielat*, 2000-Ohio-451, ¶ 8 (Article II, Section 28 of the Ohio Constitution "protects vested rights from new legislative encroachments"); *Pratte v. Stewart*, 2010-Ohio-1860, ¶ 37 (Article II, Section 28 of the Ohio Constitution prohibits the retroactive application of a statute that "impairs or takes away vested rights, affects an accrued substantive right, imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction, or creates a new right"); *see also Hubbard* at ¶ 12-14. Because the Dispatch had a vested right when it made its July 6, 2023 public-records request, we must apply the versions of the

statutes that were in effect when that request was made to avoid violating Article II, Section 28 of the Ohio Constitution.

{¶ 72} For those reasons, we should analyze this case under former R.C. 149.43, 2022 Am.Sub. H.B. No. 45, which was effective April 7 to October 2, 2023, and former R.C. 2930.07, 2022, Sub.H.B. No. 343, which was effective April 6 to July 6, 2023. *See Brown v. United States*, 602 U.S. 101, 116 (2024) (a reference to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments). Accordingly, I respectfully dissent from the majority opinion's application of the statutes that were in effect at the time the Dispatch filed its petition for mandamus.

### III. The Public Records Act

{¶ 73} The Public Records Act, R.C. 149.43, "reflects the state's policy that 'open government serves the public interest and our democratic system.'" *State ex rel. Morgan v. New Lexington*, 2006-Ohio-6365, ¶ 28, quoting *State ex rel. Dann v. Taft*, 2006-Ohio-1825, ¶ 20. The Public Records Act allows any person to request to inspect and copy public records, which are "records kept by any public office," former R.C. 149.43(A)(1), 2022 Am.Sub.H.B. No. 45. *See* former R.C. 149.43(B)(1). Additionally, the Act requires the records custodian, upon that request, to promptly prepare those records and make them available to the requester for inspection within regular business hours and to make copies available within a reasonable time. *Id.*; former R.C. 149.43(B)(7)(a).

{¶ 74} A records custodian may deny a request for public records, in whole or in part, if the requested records fall under one of the exceptions listed in R.C. 149.43(A)(1). Former R.C. 149.43(B)(1). However, simply because the requested record contains some information that is exempt from disclosure does not mean that the entire record can be withheld from the requester. The General Assembly has made clear that if a public record contains information that is exempt from

disclosure, the records custodian has a duty to make available "all of the information within the public record that is not exempt." *Id.*

{¶ 75} A requester may seek to challenge the records custodian's decision concerning the records through a writ of mandamus. Former R.C. 149.43(C); *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 2008-Ohio-1770, ¶ 5; *State ex rel. Findlay Publishing Co. v. Schroeder*, 1996-Ohio-361, ¶ 9. In defending a mandamus action, the records custodian is not limited to the reasons provided to the requester in its initial denial of the records—the records custodian is permitted to defend the action by "relying upon additional reasons or legal authority" that were not originally raised in the initial denial. Former R.C. 149.43(B)(3).

## IV.  Mandamus

{¶ 76} As recognized by the majority opinion, to be entitled to a writ of mandamus, the Dispatch "must establish a clear legal right to the requested relief and a clear legal duty on the part of [CPD] to provide the relief." *State ex rel. Cincinnati Enquirer v. Sage*, 2015-Ohio-974, ¶ 10; *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 2020-Ohio-5371, ¶ 24. The Dispatch's burden of production is to plead facts that show that it had requested the public records and that CPD did not make the records available. *See Welsh-Huggins* at ¶ 26. The Dispatch's burden of persuasion is to establish entitlement to the extraordinary writ by clear and convincing evidence. *See id.*; *Sage* at ¶ 10.

{¶ 77} For the Dispatch to satisfy its burden, it must show by clear and convincing evidence that (1) it had requested the records, (2) the records fall within the definition of "public record" under former R.C. 149.43(A)(1), (3) CPD would be required to provide the records to the Dispatch under former R.C. 149.43(B), and (4) CPD has not provided the Dispatch with the requested records. *See Sage* at ¶ 10-11. And if the Dispatch has demonstrated by clear and convincing evidence that the requested records meet the threshold definition of public record and were withheld from disclosure, the Dispatch is entitled to the record in the absence of

any exception to disclosure under the Public Records Act. *See Jones-Kelley* at ¶ 8; *Sage* at ¶ 10-11.

{¶ 78} The analysis of the Dispatch's burden in this case is straightforward. The Dispatch submitted a request to CPD for copies of all body-worn-camera and dashboard-camera footage from the shooting. CPD, the police department for the City of Columbus, is a "public office" within the meaning of R.C. 149.011(A). CPD cruisers are equipped with dashboard cameras that officers use while engaged in the performance of their official duties, and CPD officers wear body-worn cameras while they perform their duties in specific circumstances. Therefore, the footage from CPD's dashboard cameras and body-worn cameras are records kept by a public office and are considered public records under former R.C. 149.43(A)(1). Those requested records are subject to disclosure unless an exception applies. *State ex rel. Cincinnati Enquirer v. Dept. of Pub. Safety*, 2016-Ohio-7987, ¶ 34 (finding that dashboard-camera recordings fit within the definition of "public records" under R.C. 149.43(A)(1)); *State ex rel. Cincinnati Enquirer v. Cincinnati*, 2019-Ohio-3876, ¶ 5, 11 (finding that body-worn-camera footage was properly redacted under R.C. 149.43(A)(1)(v)). CPD has not provided all of the requested footage sought by the Dispatch.

{¶ 79} Thus, the Dispatch has met its burden to prove by clear and convincing evidence that the requested body-worn-camera and dashboard-camera footage from the shooting are public records kept by a public office and that CPD did not provide all of the requested records. The Dispatch is therefore entitled to a writ of mandamus compelling disclosure of the requested records unless an exception applies. *See Jones-Kelley* at ¶ 8; *Sage* at ¶ 10-11.

{¶ 80} The issue in this case is whether the requested footage from the body-worn cameras and dashboard cameras falls within one of the exceptions to disclosure under former R.C. 149.43(A)(1). In mandamus actions under the Public Records Act, this court places "the burden of proving whether the records at issue

are or are not excepted from release pursuant to R.C. 149.43," *State ex rel. Natl. Broadcasting Co. v. Cleveland*, 38 Ohio St.3d 79, 82 (1988), on the respondent, i.e., the governmental body refusing to release the records, *id.* at 83. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (the plaintiff's burden of proof regarding the essential aspects of his or her claims may be shifted to the defendant when such elements can be characterized as affirmative defenses or exemptions). This court has listed several reasons to support this rule: (1) "[A] party requesting disclosure of a record is at a distinct disadvantage when challenging a government's claim of an exception to the public records law"; (2) the government "has knowledge of the contents of the record"; (3) "placing the burden of proof on the government would be consistent with the general rule concerning statutory exceptions" because "a person asserting an exception is required to prove the facts warranting such an exception"; and (4) "placing the burden of proof on the government would . . . be consistent with this court's approach of a strict construction of the exceptions of R.C. 149.43 and the resolution of doubt in favor of disclosure." *Natl. Broadcasting Co*. at 83. We have also noted that federal courts place the burden on the government to prove that an exception applies under the federal public-records statute, the Freedom of Information Act. *Id.* at 82.

**{¶ 81}** And this court has faithfully followed that rule. "Exceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception. A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception." *Jones-Kelley*, 2008-Ohio-1770, at paragraph two of the syllabus; *see also State ex rel. Carr v. Akron*, 2006-Ohio-6714, ¶ 30; *State ex rel. Beacon Journal Publishing Co. v. Akron*, 2004-Ohio-6557, ¶ 25, *superseded by statute as stated in State ex rel. Curtis v. Turner*, 2024-Ohio-2682; *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Info. Network v. Dupuis*, 2002-Ohio-7041, ¶ 16; *State ex rel. Besser v. Ohio State*

*Univ.*, 2000-Ohio-207, ¶ 7; *State ex rel. McGowan v. Cuyahoga Metro. Hous. Auth.*, 1997-Ohio-191, ¶ 4; *State ex rel. James v. Ohio State Univ.*, 70 Ohio St.3d 168, 169 (1994).

{¶ 82} And this burden shift is supported by the statutory scheme because the respondent, as the records custodian, is the determiner of its exceptions. Under former R.C. 149.43(B)(3), a records custodian has a duty to inform the requester the reasons for denying the request but may raise additional reasons or legal authority to defend against an action for release of those records. It would make little sense for a relator to bear the burden of disproving that an exception applies when the respondent could raise other exceptions not previously asserted when defending the public-records action brought by relator under former R.C. 149.43(C).

{¶ 83} Under this burden-shifting analysis, once a relator has demonstrated that a requested record meets the threshold definition of a "public record" and that the records custodian withheld those records, the burden shifts to the respondent— i.e., the records custodian—to "plead and prove facts clearly establishing the applicability of the exemption" asserted in defense of the action, *Welsh-Huggins*, 2020-Ohio-5371, at ¶ 27. The respondent does not meet this burden if it has not proved by a preponderance of the evidence that the requested records fall squarely within the exception. *See Jones-Kelley* at paragraph two of the syllabus (records custodian bears the burden of proof to demonstrate that a record falls within an exception to disclosure); *Natl. Broadcasting Co.*, 38 Ohio St.3d at 83 (drawing parallels between Ohio's Public Records Act and the federal Freedom of Information Act and acknowledging that both statutes place the burden of proving that an exception to disclosure applies on the records custodian); *Enviro Tech Internatl., Inc. v. United States Environmental Protection Agency*, 371 F.3d 370, 374 (7th Cir. 2004) (federal government bears the burden of proving by a preponderance of the evidence that a withheld document falls within an exception

to the Freedom of Information Act).  Unless it is obvious from the content of the requested record that the record satisfies an exception, the respondent must provide evidence establishing that the record clearly meets the requirements to be prohibited from release.  *See State ex rel. Cincinnati Enquirer v. Wilson*, 2024-Ohio-182, ¶ 10; *Welsh-Huggins*, 2020-Ohio-5371, ¶ 51.

{¶ 84} CPD, as the determiner of applicable exceptions under R.C. 149.43(B)(3), has the burden to set forth the exceptions that require it to withhold the requested records under R.C. 149.43(A) and to demonstrate by a preponderance of the evidence that the requested records fall squarely within those exceptions.

### V.  The Scope of Dispatch's Request for Relief and CPD's Exceptions

{¶ 85} In analyzing CPD's exceptions, we "must make an individualized scrutiny of the records in question," *Natl. Broadcasting Co.* at paragraph four of the syllabus.  If we find that the records contain excepted information, then that "information must be redacted *and any remaining information* must be released." (Emphasis added.)  *Id.*; *see also* R.C. 149.43(B)(1) (when a public record includes both exempt and nonexempt information, the records custodian has a duty to provide the requester with all nonexempt information in the record).  Thus, we must understand the scope of the Dispatch's request and the records that are at issue in order to properly analyze whether they fall under any of CPD's claimed exceptions and are therefore not subject to disclosure.

{¶ 86} The majority opinion limits the scope of the Dispatch's request to only the unredacted footage from the four recordings that were produced by CPD for in camera review: (1) Officer Doe 1's body-worn-camera footage, (2) Officer Doe 2's body-worn-camera footage, (3) dashboard-camera footage from the Doe cruiser, and (4) dashboard-camera footage from the other cruiser.  While limiting the scope of the Dispatch's request in this manner is consistent with CPD's production of evidence and its arguments focusing on solely the two primary

officers, this limitation is not supported by the record. It appears that CPD misunderstood the scope of the Dispatch's request in this case.

{¶ 87} The Dispatch specifically requests that this court issue a writ of mandamus commanding CPD to "make all video footage responsive to the Video Footage Request available for inspection and copying in accordance with R.C. 149.43(B)(1)." The Dispatch defined the "Video Footage Request" as its July 6 records request for copies of footage from "'all body camera, dash camera . . . from the [July 6] police shooting on I-70 west.'" The Dispatch explained that this request was for all "non-exempt information contained" in the body-worn-camera and dashboard-camera footage sought by its July 6 records request. And the Dispatch maintains that CPD cannot establish that the requested records fell squarely within the victims' rights exception—specifically as its request relates to the eight officers who were involved in the shooting, whom CPD had previously claimed were victims under Marsy's Law. Therefore, the Dispatch plainly seeks *all* body-worn-camera and dashboard-camera footage from the shooting that is not excepted from disclosure under R.C. 149.43(A)(1).

{¶ 88} CPD, however, focuses its arguments and evidence in support of its claimed exceptions to disclosure on the two primary officers involved in the shooting and the four recordings that it had provided in response to the Dispatch's request, despite admitting in its answer that it had withheld identifying information of eight officers involved in the shooting under the victims' rights exception. And even after the Dispatch brought the numerical discrepancy to the forefront in its motion in opposition to CPD's motion for leave to file two John Doe affidavits, CPD's arguments continued to focus on records regarding only John Doe 1 and John Doe 2.

{¶ 89} When this court granted an alternative writ, we ordered CPD to submit "under seal for in camera inspection *all records it has withheld or redacted*." (Emphasis added.) 2024-Ohio-202. CPD submitted the redacted recordings that it

had provided to the Dispatch, their unredacted counterparts, and the two John Doe affidavits. In its merit brief, CPD explained that when it had provided the recordings to the Dispatch, it "redacted the videos to conceal the identities of the two officers who were the victims of the shooter, and to remove footage that shows severe violence and grievous bodily harm."

{¶ 90} CPD's production of evidence would be a nonissue in our review of the Dispatch's public-records request if CPD was accurate in its assertions that Officer Doe 1 and Officer Doe 2 were the only officers involved in the shooting, that it redacted and withheld information that pertained only to them, and that its production of evidence thus included "all records it has withheld or redacted" as required by our order. But the evidence plainly refutes these assertions.

{¶ 91} CPD's admission that it withheld information relating to eight officers who were involved in the shooting under the victims' rights exception indicates that more officers were involved in the shooting and therefore that the records it submitted for in camera review may have been incomplete. Indeed, a review of the unredacted evidence confirms this suspicion. Officer Doe 1 and Officer Doe 2 both attest that other officers on the scene engaged the third suspect. And a review of the unredacted footage provided to this court corroborates their statements—the unredacted footage shows that there were at least three cruisers that arrived at the scene during the incident and at least two other officers who shot at the third suspect after he had abandoned his weapon. And that footage shows that those officers who arrived at the scene and either observed or participated in the shooting had activated their body cameras. These facts are supported by an email from the Communications Director of the Office of the City Attorney in which he noted that "each of the officers and cruisers" at the scene have camera footage that could be "deemed a public record." Thus, the evidence provided by CPD plainly shows that there are other records—specifically, body-worn-camera and dashboard-camera footage from other officers at the scene who were involved

in the shooting—that are responsive to the Dispatch's request and that were withheld by CPD under the victims' rights exception. Those records should have been submitted by CPD under seal for in camera inspection in accordance with our order that CPD submit "all records it has withheld or redacted," 2024-Ohio-2781, since those records are responsive to the Dispatch's public-records request and mandamus petition.

{¶ 92} Furthermore, the evidence provided by CPD demonstrates that CPD redacted more than just identifying information of Officer Doe 1 and Officer Doe 2 from the records that were produced. In addition to redacting all the footage from the shooting in all four videos, thereby concealing the identities of the other officers involved in the shooting, CPD also redacted the voice of an officer driving the other cruiser who was not Officer Doe 1 nor Officer Doe 2. Thus, there is a legitimate issue about the number of officers involved in the shooting whose identifying information was redacted by CPD.

{¶ 93} The Dispatch has requested a copy of all body-worn-camera and dashboard-camera footage from the incident, conceding that CPD may redact footage that is excepted under the grievous-bodily-harm and act-of-severe-violence exceptions. Because the evidence indicates other records exist that are responsive to the Dispatch's request, I would not limit the scope of the Dispatch's request to only the four recordings submitted by CPD. Thus, we must review whether the withheld footage—*all* withheld footage responsive to the Dispatch's request—falls squarely within an exception.

{¶ 94} CPD acknowledges that in every public-records case, the question before this court is whether the record fits squarely within the scope of an exception. CPD asserted in its answer that "based on the ordinary application of statutory law and case law as it existed at the time of the request, . . . the subject records contain exempt information under R.C. 149.43." And CPD claims that while body-worn-camera and dashboard-camera footage is generally subject to public release, those

records may be withheld in this case under the grievous-bodily-harm exception, act-of-severe-violence exception, and the victims' rights exception. Thus, we must determine whether CPD has proved by a preponderance of the evidence that it properly withheld the footage responsive to the Dispatch's request under those exceptions. *See Jones-Kelley*, 2008-Ohio-1770, at paragraph two of the syllabus; *Summers*, 2020-Ohio-5585, at ¶ 28; *see also Natl. Broadcasting Co.*, 38 Ohio St.3d 79 at paragraph four of the syllabus.

## VI. Exceptions to Disclosure: Grievous-Bodily-Harm Exception and Act-of-Severe-Violence Exception

{¶ 95} While not its primary argument, CPD asserts that the requested footage is excepted from disclosure because it shows grievous bodily harm to a peace officer and an act of severe violence resulting in serious physical harm to a peace officer while he was performing official duties. *See* R.C. 149.43(A)(1)(jj) and (A)(17). While the Dispatch agrees that CPD can redact the footage of Officer Doe 1 being shot and his resulting injuries, the Dispatch argues that the grievous-bodily-injury and act-of-severe-violence exceptions in R.C. 149.43(A)(17) do not apply to the footage of the other officers involved in the shooting who were not injured. And the Dispatch further argues that those exceptions do not apply to the footage of the third suspect, as his death was caused by a peace officer. *See* R.C. 149.43(A)(17)(b).

{¶ 96} Restricted portions of body-worn-camera or dashboard-camera recordings are not public records. R.C. 149.43(A)(1)(jj). Related to this matter, restricted portions include any visual or audio that "shows, communicates, or discloses" grievous bodily harm to a peace officer while engaged in the performance of his or her official duties. R.C. 149.43(A)(17)(f). For purposes of the Public Records Act, grievous bodily harm means "serious bodily injury, including but not limited to fractured or dislocated bones, deep cuts, torn members of the body, and serious damage to internal organs." R.C. 5924.120(A)(6).

{¶ 97} Additionally, restricted portions of body-worn-camera or dashboard-camera recordings include any visual or audio recording that "shows, communicates, or discloses" an act of severe violence resulting in serious physical harm against a peace officer while the officer was engaged in the performance of his or her official duties. R.C.149.43(A)(17)(g). "An act of severe violence" is not defined in the statute but has been applied to cases involving gun violence. *See, e.g.*, *In re D.M.*, 2017-Ohio-8768, ¶ 24 (6th Dist.) (psychologist testified that he classified a 15-year-old's aggravated robbery and shooting at victims to be "'acts of severe violence'").

{¶ 98} However, "restricted portions of a body-worn camera or dashboard camera recording" *do not include* any visual or audio portion that "shows, communicates, or discloses" the death of a person, grievous bodily harm to a person, or an act of severe violence against a person when the act and injury was caused or effected by a peace officer. R.C. 149.43(A)(17)(b), (d), and (e). Although I believe it should, the statute enacted by the General Assembly does not exempt disclosure even when a peace officer's actions are taken in self-defense. The statute requires only that the peace officer "caused" the person's death, R.C. 149.43(A)(17)(b), or "effected" grievous bodily harm or an act of severe violence against the person, R.C. 149.43(A)(17)(d) and (e), to be considered an unrestricted portion of a body-worn-camera or dashboard-camera recording.

{¶ 99} Therefore, any of the requested footage that shows, communicates, or discloses grievous bodily harm or an act of severe violence against a peace officer must be redacted. And any of the requested footage that shows, communicates, or discloses the death of a person, grievous bodily harm to a person, or an act of severe violence against a person when the act and injury was caused or effected by a peace officer cannot be redacted.

{¶ 100} In this case, CPD was required to redact footage of Officer Doe 1 bleeding and suffering from his five gunshot wounds under the grievous-bodily-

harm exception, R.C. 149.43(A)(1)(jj) and (A)(17)(f). And CPD was required to redact footage of the third suspect shooting Officer Doe 1 under the act-of-severe-violence exception, R.C. 149.43(A)(1)(jj) and (A)(17)(g). However, under R.C. 149.43(A)(17)(b), (d), and (e), CPD was prohibited from redacting the footage of other officers shooting at the third suspect after he had dropped his weapon and was no longer committing a severe act of violence against Officer Doe 1. The only way that CPD could withhold the nonexcepted information is if it fell within another exception.

### VII.  Exceptions to Disclosure: Victims' Rights Exception

{¶ 101} CPD denied the Dispatch's public-records request and asserted, in part, that the officers present at the shooting were victims under Marsy's Law, Article I, Section 10a of the Ohio Constitution, and thus were entitled to have their information redacted and identities concealed under the current version of R.C. 2930.07. In denying the Dispatch's request, CPD relied on the victims' rights exception in R.C. 149.43(A)(1)(rr), which prohibits the release of "records, documents, and information" that cannot be released under R.C. 2930.04 and 2930.07. CPD argues that because Officer Doe 1 and Officer Doe 2 are crime victims, the Revised Code requires redaction of their identifying information from public records.

{¶ 102} As discussed, we are required to apply the versions of the statutes that were in effect at the time the Dispatch filed its public-records request. Hence, we must determine whether the requested footage was prohibited from release under Marsy's Law and former R.C. 2930.04 and 2930.07.

{¶ 103} In enacting Sub.H.B. No. 343, which went into effect April 6, 2023, the General Assembly created a process to protect a victim's name, address, and other identifying information included in "case documents" from public release. *See* former R.C. 2930.07 and 2930.04. A public office was required to "take measures to prevent the public disclosure" of the victim's identifying information

through the redaction process set forth in former R.C. 2930.07(D). Former R.C. 2930.07(C). And under the process, a public office was required to redact the victim's identifying information from "all case documents" after the victim or the victim's representative submitted a written request for redaction. Former R.C. 2930.07(D)(1).

{¶ 104} The General Assembly also provided a temporary, automatic opt-in period for victims who did not complete the written request upon their first contact with law enforcement by providing those victims with all statutory rights to privacy until that victim had been contacted by the prosecutor "within seven days of initiation of a criminal prosecution." Former R.C. 2930.04(E); *see* former R.C. 2930.04(B)(1)(d). If a victim refuses to "request or waive the victim's applicable rights," the law-enforcement agency must designate so on the request form. *Id.* Thus, a public office needed to take measures to protect a victim's identifying information even without the victim's written request during the temporary, automatic opt-in period. Former R.C. 2930.04(B)(1)(e); *see* former R.C. 149.43(A)(1)(rr) (records that are prohibited from release under R.C. 2930.04 are not subject to disclosure).

{¶ 105} In sum, under former R.C. 149.43(A)(1)(rr), a victim's identifying information within a "case document" during the temporary, automatic opt-in period and during the period when the victim or victim's representative requested redaction was prohibited from release. In this case, for the requested records to fall squarely within the victims' rights exception in former R.C. 149.43(A)(1)(rr), there must be evidence that (1) the officers whose information was redacted are victims, (2) the requested records were "case documents" that were subject to redaction by CPD, and (3) either the officers submitted written requests for redaction to CPD or the redactions fell within the temporary, automatic opt-in period.

{¶ 106} The majority opinion conducts a partial analysis of this issue, focusing solely on whether the officers are victims, and maintains that we do not

need to further analyze the issue, because the Dispatch did not challenge the remaining elements. *See* Majority opinion, ¶ 13, fn. 1. But as previously discussed, and as recognized by the majority opinion, *id.* at ¶ 11, the burden is on CPD to prove that an exception applies. The Dispatch's failure to challenge elements of this exception does not alleviate CPD of its burden to demonstrate that the records fall squarely within the exception, as that would switch the burden from the government to prove an exception applies to the relator to disprove that the exception applies.

{¶ 107} Additionally, we have held that the records custodian must provide evidence establishing that the requested record clearly meets the requirements to be prohibited from release when it is not obvious from the content of the record that the record falls within an exception. *Wilson*, 2024-Ohio-182, at ¶ 10. Under our precedent, we must analyze whether all elements of the exception are met. In doing so, we properly perform our duty to ensure that a record is not wrongly withheld under the asserted exception. *Natl. Broadcasting Co.*, 38 Ohio St.3d 79 at paragraph four of the syllabus.

{¶ 108} In this case, it is not clear from the content of the produced records that the records are prohibited from release under this provision. Thus, CPD has the burden to prove that the exception applies. *See id.* at paragraph two of the syllabus. If CPD fails to produce evidence to support each element necessary to exercise the victims' rights exception, then CPD fails to establish that the requested records fall within the exception.

*A. Officers can be victims under Marsy's Law*

{¶ 109} The Ohio Constitution guarantees victims of crimes certain rights under Article I, Section 10a, also known as Marsy's Law. Under Marsy's Law, a "victim" is "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act." Ohio Const., art. I, § 10a(D). The General Assembly adopted this

definition of "victim." *See* former R.C. 2930.01(H), 2022 Sub.H.B. No. 343. And that definition applies to former R.C. 2930.04 and 2930.07.

{¶ 110} The great debate in this case is whether on-duty officers can be victims under Marsy's Law. I wholly agree with the majority opinion that officers can be victims under the definition of "victim" in Marsy's Law and R.C. 2930.01(H). *See* majority opinion at ¶ 18. We cannot, as the Dispatch requests, limit the scope of the definition of "victim" to exclude officers who become victims during the course of their duties. As stated in the majority opinion, police officers are people, too, and thus may qualify as victims under Marsy's Law. *Id.*

{¶ 111} We can reach no other conclusion. The statutory language adopts the constitutional language, and Marsy's Law places no restriction on when a person may become a victim—it provides only that a person is a victim if (1) a criminal offense was committed against that person or (2) the person was directly and proximately harmed by the commission of the criminal act or offense. *See* Ohio Const., art. I, § 10a(D). And we cannot rewrite the constitutional language to mean something other than what it plainly states—the language of the Constitution controls as written unless changed by the people through the amendment procedures in the Ohio Constitution. *See Cleveland v. State*, 2019-Ohio-3820, ¶ 16 (lead opinion). Thus, I unequivocally agree with the majority opinion that an officer who meets the aforementioned criteria is a victim as defined by Marsy's Law.

{¶ 112} And in this case, I agree with the majority opinion that CPD has clearly demonstrated that Officer Doe 1 and Officer Doe 2 are victims under Marsy's Law. Majority opinion at ¶ 19. However, CPD has not argued that the other officers who had their information redacted from the videos that were produced or otherwise withheld from review are also victims. In fact, CPD conceded at oral argument that those officers are not victims as defined by Marsy's Law and R.C. 2930.01(H), because there is no evidence in this record that the third

suspect committed a criminal act against any officer other than Officer Doe 1 and Officer Doe 2 or that the third suspect directly and proximately harmed any other officer through the commission of the offense or act. And based on my independent review of the evidence provided by CPD and the Dispatch, the unredacted footage supports CPD's concession that the other officers are not victims under Marsy's Law, because the footage shows that every officer at the scene, with the exception of Officer Doe 1 and Officer Doe 2, arrived after the third suspect had abandoned his weapon and fled. Therefore, based on CPD's concession and the record before this court, the other officers are not victims and thus the victims' rights exception cannot apply to them.

 *B. CPD has demonstrated that the records are "case documents"*

**{¶ 113}** The next question is whether the requested records are "case documents" under former R.C. 2930.07. CPD recognizes that it may redact "case documents" but mistakenly relies on the definition of "case document" in the *current* version of R.C. 2930.07(A)(1)(a) to support its argument that the unredacted footage is a case document that may be redacted. However, we cannot use the amended definition of "case document," because the amendment went into effect on July 7, 2023, the day *after* the Dispatch made the public-records request at issue here, and doing so would contravene Article II, Section 28 of the Ohio Constitution, *see Bielat*, 2000-Ohio-451, at ¶ 8. Thus, we must determine whether the requested records fall within the definition of "case document" in former R.C. 2930.07(A)(1):

> (a) "Case document" means a document or information in a document regarding a case that is submitted to a court, a law enforcement agency or officer, or a prosecutor or filed with a clerk of court, including, but not limited to, pleadings, motions, exhibits, transcripts, orders, and judgments, or any documentation prepared

by a court, clerk of court, or law enforcement agency or officer, or a prosecutor regarding a case.

(b) "Case document" does not include materials subject to the work product doctrine, materials that by law are subject to privilege or confidentiality, or materials that are otherwise protected or prohibited from disclosure by state or federal law.

2022 Sub.H.B. No. 343.

{¶ 114} This definition of "case document" is not a model of clarity. There are two ways that the former version of division (A)(1)(a) may be read: (1) the document or information in the document must be "regarding a case" *and* the document or information in the document has been "submitted to . . . or filed with" the appropriate entity; *or* (2) the document or information in the document must be "regarding a case" *and* that *case* has been "submitted to . . . or filed with" the appropriate entity. Reading the provision in context does not permit the first reading—the General Assembly's nonexhaustive list of documents that qualify as "case documents" includes documents that are never submitted or filed with any entity, such as orders, judgments, and other documents made by the court, as those documents are merely entered on the journal by the clerk of courts. *See* R.C. 1901.31(E) (municipal-court clerks accept filings and record proceedings of the court on the docket); R.C. 2303.08 (the clerk of a court of common pleas enters orders, decrees, judgments, and proceedings of courts on the journal); R.C. 2303.081(A) (pleadings or documents are filed with the clerk of a court of common pleas). Reading former 2930.07(A)(1) in context supports only the second reading that the document or information in the document is regarding a case *and* that the *case* has been submitted to or filed with the appropriate entity. *See State ex rel. Antonucci v. Youngstown City School Dist. Bd. of Ed.*, 2000-Ohio-246, ¶ 8 ("words and phrases shall be read in context"). Thus, for a record to be a "case document,"

it must be (1) a document or information in a document, (2) regarding a case, and (3) that case must have been submitted or filed with the appropriate entity. *See* former R.C. 2930.07(A)(1)(a).

{¶ 115} While the term "document" is undefined in this statute, we can easily conclude that the term would encompass recordings from body-worn cameras and dashboard cameras, as they are documentation prepared by law enforcement. *Dept. of Pub. Safety*, 2016-Ohio-7987, at ¶ 34 (body-worn cameras and dashboard cameras "document governmental activities, decisions, and operations" of law-enforcement officers). And this conclusion is consistent with this court's understanding that recordings can fall within the definition of "document." *See Black's Law Dictionary* (12th Ed. 2024) (defining "document" generally as a "written instrument" but also as encompassing "any information stored on a computer, electronic storage device, or any other medium"); *State v. Dorso*, 4 Ohio St.3d 60, 62 (1983) (undefined terms are construed in accordance with common, everyday meaning).

{¶ 116} The next question is whether the recordings are "regarding a case" that has been submitted or filed with the appropriate entity. The General Assembly previously defined "case" as "a delinquency proceeding and all related activity or a criminal prosecution and all related activity." Former R.C. 2930.01(L), 2022 Sub.H.B. No. 343. Under that definition of "case," the phrase "all related activity" included investigations or documentation of a criminal offense when a criminal prosecution could result. This interpretation ensures that we give meaning to the phrase "submitted to . . . a law enforcement agency or officer," former R.C. 2930.07(A)(1)(a), 2022 Sub.H.B. No. 343, since no other information relating to the prosecution of a case would be submitted to the law-enforcement agency or officer. *See Columbia Gas Transm. Corp. v. Levin*, 2008-Ohio-511, ¶ 19 (courts may not delete words used or insert words not used in a statute). So the term "case" necessarily encompasses any activity related to a criminal prosecution, which could

include persons reporting crimes and law-enforcement agencies or officers taking actions to investigate crimes.

{¶ 117} Here, the requested recordings were created by body-worn cameras and dashboard cameras, which were activated as a result of CPD's pursuit of suspects who had committed a robbery. The requested footage captured the suspects committing multiple criminal offenses during the chase and subsequent shooting. And while one suspect died at the scene, the two who escaped were apprehended by law enforcement. So the footage portrays an activity related to a criminal prosecution in the form of an investigation into a robbery that was submitted to a law-enforcement agency or officer, and the two suspects who were apprehended could be prosecuted for their roles in the robbery and shooting. Thus, the requested recordings are regarding a "case" that was submitted to law enforcement.

{¶ 118} In sum, the requested recordings fall under the definition of "case document" under former R.C. 2930.07(A)(1)(a) so long as they do not contain "materials subject to the work product doctrine, materials that by law are subject to privilege or confidentiality, or materials that are otherwise protected or prohibited from disclosure by state or federal law," former R.C. 2930.07(A)(1)(b), 2022 Sub.H.B. No. 343.

*C. CPD's duty to redact "case documents"*

{¶ 119} The last question is whether CPD was required to redact or otherwise withhold the requested records under former R.C. 2930.04 and 2930.07. CPD acknowledges its duty to redact a victim's identifying information when the victim or the victim's representative has submitted a written request for redaction, *see* former R.C. 2930.07(D)(1), or during the temporary, automatic opt-in period that occurs when a victim has not filled out the request form and the prosecutor has not yet initiated contact with the victim, *see* former R.C. 2930.04(E). CPD also

acknowledges that it must show that the requested records fall squarely within the claimed exception.

{¶ 120} However, CPD has provided no evidence of a written request by Officer Doe 1 or Officer Doe 2 to redact their information under former R.C. 2930.07(D)(1). The affidavits of Officer Doe 1 and Officer Doe 2 do not mention any request for redaction. Nor do any of the affidavits submitted by any other CPD employee indicate that any written requests for redaction were submitted. And while CPD should have at least two request forms to indicate that Officer Doe 1 and Officer Doe 2 either completed the forms or refused to request or waive their applicable rights, *see* former R.C. 2930.04(F), CPD did not submit any forms as evidence to indicate that the officers exercised, declined to exercise, or were unable to exercise this right. Thus, we cannot say whether the redactions were justified by a written request under former R.C. 2930.07(D)(1).

{¶ 121} And we cannot construe CPD's motion for leave to file John Doe affidavits to protect Officer Doe 1 and Officer Doe 2's information as a written request for redaction under former R.C. 2930.07. Under former R.C. 2930.07(D)(1), the written request has to be submitted by the victim or the victim's representative, and CPD is not a "victim's representative" as defined under former R.C. 2930.01(I) or 2930.02, because CPD is not a "person" but a "public agency" under former R.C. 2930.01(F). And CPD's motion for leave to file John Doe affidavits does not suggest that the motion was filed based on the officers' desires to have their information redacted; rather, the motion demonstrates that it was filed based on CPD's belief that it had a duty to redact the information under the statute. Thus, CPD's motion for leave to file John Doe affidavits cannot serve as the "written request" necessary for CPD to redact the identifying information of Officer Doe 1 and Officer Doe 2 under former R.C. 2930.07(D)(1).

{¶ 122} And lastly, CPD has provided no evidence that it redacted the victims' information in accordance with the temporary, automatic opt-in period

46

allotted by former R.C. 2930.04. Without filling out the request form, the victims had a statutory right to privacy until they were contacted by the prosecutor within seven days of initiation of criminal prosecution. Former R.C. 2930.04(E); *see* former R.C. 2930.04(B)(1)(d). The two other suspects were apprehended days after the shooting, but we have no information in the record about their current status.

{¶ 123} Perhaps leaving out the request forms was intentional—perhaps the Dispatch and CPD believed that, with only the information provided, we would presume that the temporary, automatic opt-in period continued in perpetuity. But if we were to turn a blind eye to this lack of evidence and reach such a conclusion, then other public offices might withhold evidence from our review in order to avoid the time restrictions imposed by the General Assembly. And such a conclusion would contravene our precedent requiring public offices to provide evidence that the requested records clearly meet the requirements prohibiting their release. *See Welsh-Huggins*, 2020-Ohio-5371, at ¶ 30 (respondent must provide evidence to support the applicability of an exception); *Jones-Kelley*, 2008-Ohio-1770, at ¶ 22-26 (director failed to introduce evidence in the record to demonstrate that certified foster caregivers were caring for eligible children and thus had not met the burden to establish that the disclosure of the names and addresses of such caregivers would expose public-assistance recipients or applicants).

{¶ 124} However, because this case clearly involves two victims and the possible public release of their identifying information, which is protected by statute and may be protected under Marsy's Law, I think it is appropriate that we take judicial notice of the criminal proceedings against the two suspects because those proceedings are not subject to reasonable dispute and will resolve this issue in this action. *See* Evid.R. 201(B); *State ex rel. Womack v. Marsh*, 2011-Ohio-229, ¶ 8 (court of appeals could take judicial notice of entry attached to a motion to dismiss that would render a mandamus claim moot); *State ex rel. Nyamusevya v. Hawkins*, 2020-Ohio-2690, ¶ 33 (10th Dist.). Here, the two suspects who fled but

were later apprehended have been charged and convicted in federal court of crimes related to the robbery and the shooting. *See United States v. Darod*, S.D.Ohio No. 2:23-cr-152-1 (Jan. 17, 2025); *United States v. Jama*, S.D.Ohio No. 2:23-cr-152-2 (Jan. 21, 2025). And the Franklin County docket does not show any criminal proceedings pending against the two suspects.

{¶ 125} Because the two suspects were never charged in Ohio and were charged by the United States, the temporary, automatic opt-in remains open, because the term "prosecutor" as defined in former R.C. 2930.01(E) does not include federal prosecutors. Thus, the officers did not have the necessary contact with the prosecutor after the criminal prosecution was initiated to close the temporary, automatic opt-in period. Because the opt-in period was never closed, CPD had the authority to withhold and redact identifying information of Officer Doe 1 and Officer Doe 2 under former R.C. 2930.04's temporary, automatic opt-in period.

### D. CPD can redact the identifying information from Officer Doe 1 and Officer Doe 2 from the requested records

{¶ 126} CPD has demonstrated that Officer Doe 1 and Officer Doe 2 were victims, the requested records are case documents, and the identifying information of Officer Doe 1 and Officer Doe 2 was required to be redacted from those case documents under the temporary, automatic opt-in period extended to the victims under former R.C. 2930.04. Thus, CPD has demonstrated that the records requested by the Dispatch that contain identifying information of Officer Doe 1 and Officer Doe 2 are exempt from disclosure under R.C. 149.43(A)(1)(rr).

{¶ 127} However, because the other officers involved in the shooting are not victims, as conceded by CPD, CPD cannot withhold the records that are responsive to the Dispatch's request related to those officers.

### VIII.  We Should Grant a Partial Writ of Mandamus

{¶ 128} The Dispatch requested all body-worn-camera recordings and dashboard-camera recordings from the shooting that are not excepted from review, seeking all footage from the shooting.  The Dispatch has demonstrated that the requested footage falls under CPD's jurisdiction and that it meets the threshold definition of a public record under R.C. 149.43(A)(1).  *See Sage*, 2015-Ohio-974, at ¶ 11.  The burden then shifted to CPD to demonstrate by a preponderance of the evidence that the unredacted footage was exempt from disclosure.  *See Jones-Kelley*, 2008-Ohio-1770, at paragraph two of the syllabus; *Natl. Broadcasting Co.*, 38 Ohio St.3d at 83; *Enviro Tech Internatl., Inc.*, 371 F.3d at 374.

{¶ 129} CPD demonstrated and the Dispatch conceded that portions of the requested footage were exempt from disclosure under the act-of-severe-violence exception, R.C. 149.43(A)(1)(jj) and (A)(17)(g), and the grievous-bodily-harm exception, R.C. 149.43(A)(1)(jj) and (A)(17)(f).  CPD also demonstrated that portions of the requested footage that revealed the identifying information of Officer Doe 1 and Officer Doe 2 were exempt from disclosure under the victims' rights exception, R.C. 149.43(A)(1)(rr).  However, CPD conceded and the evidence demonstrates that the other officers involved in the shooting were not victims and did not fall under the victim's rights exception.  Thus, portions of the requested footage from the shooting that are not excepted are public records subject to disclosure and should have been produced by CPD.  For those reasons, the Dispatch is entitled to a partial writ of mandamus.

{¶ 130} However, the Dispatch is not entitled to statutory damages, court costs, or attorney fees; it waived those rights by failing to address those issues in its brief.  *See State ex rel. Grim v. New Holland*, 2024-Ohio-4822, ¶ 8; *State ex rel. Stuart v. Greene*, 2020-Ohio-3685, ¶ 10; *State ex rel. Mun. Constr. Equip. Operators' Labor Council v. Cleveland*, 2007-Ohio-3831, ¶ 83.

{¶ 131} For those reasons, I must respectfully concur in part and dissent in part.

_____

**BRUNNER, J., concurring in part and dissenting in part.**

{¶ 132} I agree with the majority that a police officer may be a "victim" of a crime under R.C. 2930.07. I disagree, however, with the majority's conclusion that R.C. 2930.07 is constitutional as applied in this case. In my view, the Ohio Constitution guarantees Ohioans the right to access information about their government, and that right requires this court to grant a partial writ of mandamus ordering respondent, the Columbus Police Department, to produce the video footage at issue in this case without redactions concealing the identities of the police officers shown in the videos.

{¶ 133} In America, the government's power derives from "the consent of the governed." Declaration of Independence, July 4, 1776. Ohio's government is also founded on this principle: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same." Ohio Const., art. I, § 2; *see also* U.S. Const., art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government").

{¶ 134} For the public to grant its consent to be governed, the public must have information about the government's conduct. For the public's consent to be effective and meaningful, it must be *informed* consent—as opposed to *un*informed or *mis*informed consent. And informed consent requires knowledge:

A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the

power which knowledge gives.

9 *The Writings of James Madison* 103 (Hunt Ed. 1910). Thomas Jefferson argued that "[t]he way to prevent [errors of] the people is to give them full information of their affairs thro' the channel of the public papers, and to contrive that those papers should penetrate the whole mass of the people." 11 *The Papers of Thomas Jefferson* 49 (Boyd Ed. 1955).

{¶ 135} While much has changed in American society since the founding of its government, the concern voiced in these writings that continues today is the notion that knowledge is required for the public to provide informed consent. As one legal scholar observed:

> The public, as sovereign, must have all information available in order to instruct its servants, the government. As a general proposition, if democracy is to work, there can be no holding back of information; otherwise ultimate decisionmaking by the people, to whom that function is committed, becomes impossible.

Thomas I. Emerson, *Legal Foundations of the Right to Know*, 1976 Wash.U.L.Q. 1, 14 (1976). As these writings have recognized, the government serves the people as a body politic—not vice versa. But when the government limits the information to which the public has access, it prevents the public from gaining the knowledge required to provide informed consent to be governed. And in doing so, the government skirts the fundamental state constitutional principle that Ohioans have expressly retained their rights to self-governance with power being inherent in the people. *See* Ohio Const., art. I, § 2.

{¶ 136} If this court acquiesces to the other branches of government before it fulfills the duty to ensure that the power of self-governance reserved by the people

is kept by them, it tips the scales toward political slavery to the government officials who are required to serve *them*. And when such a scenario exists, the people's further consent is at best starved of knowledge and at worst procured through obfuscation, or deception, that usually accompanies corruption.

{¶ 137} This court has recognized that:

> A fundamental premise of American democratic theory is that government exists to serve the people. In order to ensure that government performs effectively and properly, it is essential that the public be informed and therefore able to scrutinize the government's work and decisions. . . .
>
> Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance. . . . Public records afford an array of other utilitarian purposes necessary to a sophisticated democracy: they illuminate and foster understanding of the rationale underlying state decisions, . . . promote cherished rights such as freedom of speech and press, . . . and "foster openness and . . . encourage the free flow of information where it is not prohibited by law." *State ex rel. The Miami Student v. Miami Univ.* (1997), 79 Ohio St.3d 168, 172, 680 N.E.2d 956.

(Fourth ellipsis added in *Kish*.) *Kish v. Akron*, 2006-Ohio-1244, ¶ 15-16. "[O]pen access to government papers is an integral entitlement of the people, to be preserved with vigilance and vigor." *Id.* at ¶ 17.

{¶ 138} Among the most prominent rights guaranteed by the Ohio Constitution are rights ensuring that the government does not obstruct the flow of information needed for the people to provide informed consent. Article 1, Section

3 guarantees Ohioans "the right to assemble together, in a peaceable manner, to consult for their common good; to instruct their representatives; and to petition the general assembly for the redress of grievances." Article 1, Section 11 provides that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." Article 1, Section 16 provides that "[a]ll courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

{¶ 139} The development of our caselaw surrounding these provisions has been affected by the fact that the United States Constitution contains similar provisions. For example, the United States Supreme Court has interpreted the First Amendment to the United States Constitution as protecting the right to receive in the mail "communist political propaganda" from abroad without first having to notify the government and request that such mail be delivered. *Lamont v. Postmaster General of the United States*, 381 U.S. 301, 305-307 (1965). Because of the United States Supreme Court's holding that the First Amendment's guarantees of free speech and press are among the liberties that the Fourteenth Amendment protects against state action, *see Near v. Minnesota*, 283 U.S. 697, 707 (1931), we have no reason to consider whether a materially similar state law would violate the Ohio Constitution; even if we held that the Ohio Constitution did *not* bar such a law, the law would still be invalid under the First Amendment to the United States Constitution. Nonetheless, it is "well established that the [federal] Constitution protects the right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), and in that general sense, there can be no law or holding that would deprive Ohioans of this right, and thus, it is safe to conclude that the Ohio Constitution—like the United States Constitution—similarly protects the right to receive information and ideas.

{¶ 140} The Ohio Constitution also places a special emphasis on the presentation of *truthful* information to voters when they are asked whether they consent to a state constitutional amendment. The ballot language for such an amendment must "properly identify the substance of the proposal to be voted upon" and it may not be "such as to mislead, deceive, or defraud the voters." Ohio Const., art. XVI, § 1 (concerning constitutional amendments proposed by the General Assembly); *see also* Ohio Const., art. II, § 1g (providing that the regulations of Article XVI, Section 1 apply to constitutional amendments proposed by petition).

{¶ 141} Ohio's Constitution clearly embraces the notion that public access to information about the government is essential to democratic self-governance. Were it otherwise—i.e., if the contours of this right could be defined solely by the legislature—then the legislature could corruptly obtain the consent of the governed through careful curation of its work and through incomplete disclosure of its records and information. Thus, I would hold that the Ohio Constitution *guarantees* the public the right to access government records.

{¶ 142} If we are to act as intended by Article IV of Ohio's Constitution, we must mediate the right to access government records between the people and the other two branches of the State by balancing their inherent powers and ensuring that the right of the people to know does not hamper the government's duty to serve by imposing restrained and judicious limitations. In this case, we are confronted with several possible limitations to the disclosure of government records that are based on privacy concerns. The first is contained in the Ohio Constitution, which guarantees victims of crime a right of "privacy," *see* Ohio Const., art. I, § 10a(A)(1).

{¶ 143} In theory, the conflict between the public's right to access government records and a crime victim's right to privacy could be reconciled in a number of ways. *See generally* Emerson, 1976 Wash.U.L.Q. at 21-22 (discussing possible approaches to reconciling these two constitutional rights). But even

presuming that the victim's right to privacy would normally take precedence over the public's right to access government records, I would find that that presumption has been overcome here.

{¶ 144} While "no comprehensive or accepted definition of privacy exists today," *id.* at 22, the General Assembly has attempted to create certain limitations to disclosure under Ohio's public-records law to protect crime victims' rights to privacy. R.C. 2930.07(D)(1)(a)(i) provides that, on the request of a crime victim, case documents may be redacted to remove "the name, address, or other identifying information of the victim." In defining this limitation to public-records disclosure, however, the legislature has made no mention of situations in which the crime victim is a public official. In that situation, I would hold that it is essential to consider and determine the public official's *expectation* of privacy in the information at issue.

{¶ 145} In the present case, this consideration leads me to the conclusion that the privacy right in Article I, Section 10a of the Ohio Constitution must give way to the public's right to access government records. The crime victims here are police officers. Police officers are charged with many critical responsibilities, some of which they fulfill outside of public view. But many of those responsibilities are—and by definition must be—performed in and before the public. The present case involves information concerning only public events: As the other two opinions in this case explain, the public-records request for bodycam and dashcam footage in this case arises from a shootout that erupted in the middle of a public highway during daytime hours. The suspects stopped their car in the middle lane, blocking traffic, and it was on that public highway that the officers became victims of crimes.

{¶ 146} It is clear that all of the recorded bodycam and dashcam footage at issue shows events that took place in public and that could have been viewed by members of the public who happened to be on that public highway or nearby. Because the officers were on duty and performing their duties in a public place, I

would hold that they did not have an expectation of privacy in their names and identities. That is particularly true given that a directive of the Columbus Police Department provides that the department's personnel "shall give their name and badge/tech/IBM number to any person upon request" and that "[u]niformed sworn personnel shall display their identification card to any person upon request or as soon as safe and practical." *See* Columbus Police Division Directive 1.01, available at https://www.columbus.gov/files/sharedassets/city/v/2/public-safety/police /directives/divisiondirective1.01.pdf (accessed Oct. 22, 2025) [https://perma.cc/Z8HL-DWE6]. Once the officers are on duty in public, they do not have an expectation of privacy in their names or identities. I would therefore hold that Article I, Section 10a does not provide a justification for the Columbus Police Department to redact *all* footage revealing the names and identifying information of the officers in question. I would hold that R.C. 2930.07 is unconstitutional as applied in this case, as it violates the Ohio constitutional right to access government records.

{¶ 147} And there are two other limitations on the public's right to access government records that are at issue in this case. Both are statutory exceptions within the Public Records Act, R.C. 149.43. Generally speaking, these exceptions exempt from disclosure portions of bodycam or dashcam footage showing grievous bodily harm to a peace officer or to an act of severe violence resulting in serious physical harm to a peace officer while he was performing official duties. *See* R.C. 149.43(A)(1)(jj) and (A)(17)(g). While police officers may not expect that their *identities* will be private while they perform their duties in public, they nonetheless maintain an expectation of privacy in bodycam or dashcam footage that shows the stated forms of harm to them as described in these provisions. I would therefore hold that these provisions justify redactions in the footage at issue that show the Columbus police officers being injured. But I would diverge from the majority opinion and hold that a partial writ of mandamus should be granted ordering the

Columbus Police Department to produce the video footage at issue in this case without redactions that conceal the identities of the police officers shown in the videos.

{¶ 148} For these reasons, I respectfully concur in part and dissent in part.

_____

Faruki, P.L.L., and John C. Greiner, for relator.

Zachary M. Klein, Columbus City Attorney, and Aaron D. Epstein and Joshua P. Monroe, Assistant City Attorneys, for respondent.

Harshman, Wannemacher, Tipton & Lipperman and Lathan J. Lipperman, urging denial for amicus curiae Fraternal Order of Police, Capital City Lodge #9.

Gwen Callender, urging denial for amicus curiae Fraternal Order of Police of Ohio.

Dave Yost, Attorney General, Mathura J. Sridharan, Solicitor General, and Jana M. Bosch, Deputy Solicitor General, urging denial for amicus curiae Ohio Attorney General Dave Yost.

_____